**Khawaja Shams-ul-Islam**
*Advocate High Courts & Supreme Court of Pakistan.*

To The Clerk of The Court:

Please put #27 Mustafa Avenue, Block-9, Clifton, Karachi. - Pakistan.
this document in the public file; Tel.No. 021-5833909 - 5833918 - Fax : (92-21) 5877424
E-mail : khshams_65@yahoo.com

LLS 6/28/07

Louis L. Stanton
U.S.D.J

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/3/07
```

May 19, 2007.

BEFORE HON. LOUIS L. STANTON
UNITED STATES DISTRICT JUDGE, U.S. DISTRICT COURT
SOUTEHRN DISTRICT OF NEW YORK

Docket No.07-3728

CAI INTERNATIONAL, INC..................................................................PLAINTIFF.

AGAINST

MEGAFLEET (PRIVATE) LIMITED, INSHIPPING (PRIVATE) LIMITED, INSHIP (PRIVATE) LIMITED, INSERVEY PAKISTAN (PRIVATE) LIMITED, MEGAIMPEX PAKISTAN (PRIVATE) LIMITED, MEGA IMPEX (PRIVATE) LIMITED, MEGATECH (PRIVATE) LIMITED, MEGATRANS PAKISTAN (PRIVATE) LIMITED, INTRA 21 (PRIVATE LIMITED), INTRA TWENTY ONE (PRIVATE) LIMITED, MSC PAKISTAN (PRIVATE) LIMITED, FORBES FORBES CAMPBELL & CO. (PRIVATE) LIMITED, M-LOG (PRIVATE) LIMITED, FORBES SHIPPING (PRIVATE) LIMITED, FORBES LATHAM (PRIVATE) LIMITED, FORBES TELECOMMUNICATIONS (PRIVATE) LIMITED, FORBES TELECOM (PRIVATE) LIMITED, MEGATRAVEL PAKISTAN (PRIVATE) LIMITED, SEACON (PRIVATE) LIMITED, SEALOG (PRIVATE) LIMITED, SEAEXPRESS (PRIVATE) LIMITED, FORBES LOGISTICS (PRIVATE) LIMITED, FORBES LOGICOM (PRIVATE) LIMITED, MEGARAIL (PRIVATE) LIMITED, MEGATRANSPORT (PRIVATE) LIMITED, FORBES SHIPPING COMPANY (PRIVATE) LIMITED, M. HABIBULLAH KHAN......DEFENDANTS.

Honourable Judge,

My Lord,

I am addressing you on behalf of my clients, the above-named companies, who are Defendants before your honour, except M/s. Mega Fleet (Private) Limited and Mega & Forbes Group of Companies, who are neither registered in Pakistan nor outside Pakistan, and has no legal, corporate and juristic entity within the parameters of Securities & Exchange Commission of Pakistan, Corporate Law Authority Pakistan, and Pakistan's Companies Ordinance, 1984, therefore, arraying them before your honour as

*Khawaja Shams-ul-Islam*
*Advocate Supreme Court*

2

Defendants is absolutely uncalled for and misleading act on part of the Plaintiff with whom my clients have no privity fo alleged Maritime Contract.

Your honour may kindly appreciate that it is a well settled principle of law that **"act of court shall prejudice no man"**, as my aforesaid clients have no privity of contract with the Plaintiff. I am enclosing herewith the alleged draft of agreement which was neither signed by the Companies mentioned as Defendants before your honour nor by Mr. Habibullah Khan in his personal capacity, hence suing them thousands of miles away from Pakistan, in U.S.A., and obtaining an exparte injunction order without inviting your honour's gracious attention towards the alleged Maritime Contract, has caused tremendous loss to my clients.

Your Lordship may kindly further appreciate that the suit of the Plaintiff as purportedly based on a so-called breach of Maritime Contract, which my clients deny. However, if your Lordship may graciously be kind enough to peruse that so-called Maritime Contract, your honour would find in clause 11(a) under the heading "General" (Exhibit 'A' – General Terms & Cnditions), which is reproduced below for your honour's kind perusal:-

> "11(a) GENERAL
> *This agreement is binding upon the parties, their permitted successors and assigns and shall be construed and interpreted in accordance with the laws of the United States of America and, except where inconsistent therewith, with the laws of the State of California. With respect to any claim or controversy arising out of or relating to this agreement, the parties consent to the jurisdiction of the State and Federal Courts located in San Francisco, California, U.S.A."*

*Khawaja Shams-ul-Islam*
*Advocate Supreme Court*

*Continuation Sheet*

3

The perusal of the above clause proves beyond any doubt that this Hon'ble Court has no jurisdiction to pass any order on the ground of non-existence of any agreement as well as for want of jurisdiction, hence the impugned order whereby my clients' properties have been attached, is ***corum non judice***, therefore, liable to be vacated.

Your honour may kindly appreciate that even the addresses of my clients have not been mentioned in the entire plaint which my clients have received from the Bank, i.e., B.N.P. PARIBAS New York, U.S.A., together with the exparte attachment orders passed by this Hon'ble Court. I once again reiterate that my clients have no privity of contract with the Plaintiffs and this letter is being sent without prejudice to the contentions, rights and all legal pleas, which my client has every right to take before the competent court of law which has the jurisdiction to proceed with the matter.

Your honour, I would be grateful if your honour may be gracious enough to allow me to come to U.S.A., to assist this Hon'ble Court as Attorney of my clients, as my clients for want of funds, are not in a position to bear the awesome legal expenses and professional fees of lawyers at U.S.A.

**KHAWAJA SHAMS-UL-ISLAM**
**ADVOCATE**

To The Clerk of The Court:
Please docket and place
this document in the public file.

LLS 6/28/07
Louis L. Stanton
U.S.D.J



CAI-INTERPOOL, LLC
One Embarcadero Center, Suite 2101
San Francisco, CA 94111, U.S.A.
Tel: (415) 788-0100 • Fax: (415) 788-3430

## MEGA & FORBES GROUP OF COMPANIES
## MEGAFEEDER (PRIVATE) LIMITED
## CAI-INTERPOOL, LLC
## LONG TERM AGREEMENT

(CONTRACT NUMBER : MEGA-002)

This is a Long Term Lease Agreement dated June 1, 2006 between CAI-Interpool, LLC, One Embarcadero Center, Suite 2101, San Francisco, CA 94111, U.S.A. ("Lessor") and Mega & Forbes Group of Companies, P.N.S.C. Building, Moulvi Tamizuddin Khan Road, Karachi, 74000, Pakistan and Megafeeder (Private) Limited, 15th Floor P.N.S.C. Building, Moulvi Tamizuddin Khan Road, Karachi, 74000, Pakistan (hereinafter jointly and severally "Lessee"). Each of Mega & Forbes Group of Companies and Megafeeder (Private) Limited shall hereinafter be jointly and severally liable for the obligations of Lessee, and agree to be bound by any actions or decisions of any of the foregoing required or permitted under this Agreement.

Lessor and Lessee expressly understand and agree that upon the execution hereof, Lessor will simultaneously assign all of Lessor's right, title and interest in and to this Agreement to Container Applications International, Inc. ("CAI"), and CAI will assume all of Lessor's obligations hereunder.

1) **SCOPE OF AGREEMENT**
   a) This Agreement covers the leasing of newly manufactured 238 x 20' x 8' x 8'6" steel convertible open top containers and 75 x 40' x 8' x 9'6" steel high cube convertible open top containers which conform to the standards set forth by ISO, TIR, CSC, and TCT (hereinafter referred to individually and collectively as "containers"), to be manufactured by Dalian Jindo Container Co., Ltd. (hereinafter referred to as "Manufacturer"), on the terms and conditions set forth below.
   b) It is specifically understood and agreed by the parties hereto that (i) the containers (as hereinafter defined) have been or will be manufactured in accordance with manufacturing specifications approved by (a) Lessee and (b) Container Network Corporation ("CNC") and/or Shine Pyung Corporation

1

MEGA-002 rev. 6/14/06

("SPC"), in relation to convertible open top containers designed by CNC and SPC, (ii) the containers accepted hereunder will be deemed to have been delivered by the manufacturer, CNC, or SPC, as the case may be, in accordance with the foregoing specifications approved by Lessee, and (iii) Lessor has neither negotiated nor approved the specifications.

2) **TERM**

This Agreement shall be effective June 1, 2006 and shall expire ten years from the Lease Commencement Date ("LCD"). The LCD shall be defined as the first day of the month following the month in which the last container goes on lease to Lessee.

3) **CONTAINER SUPPLY PROVISIONS**

   a) Commencing June, 2006 and continuing through July, 2006, Lessor agrees to lease containers to Lessee delivered to Lessee's designated facilities in Dalian, subject to manufacturer's production schedule. 20' containers shall be marked "CAXU350401-360638." 40' containers shall be marked "CAXU560001-560075." The failure, if any, of Lessor to deliver containers in accordance with the foregoing, shall not constitute a violation of this Agreement if caused by: force majeure, strike, labor trouble, failure or delay by Manufacturer to produce or deliver the containers, transportation difficulties or any other cause whatsoever beyond the control of Lessor.

   b) Containers shall be manufactured per Lessee's specifications and colors, and shall be marked with Lessor's door logo. Removal of Lessee's decals upon redelivery shall be for Lessee's expense.

   c) Execution by Lessor or its agent and Lessee or Lessee's agent of Lessor's Equipment Condition Reports with respect to each container leased hereunder shall constitute conclusive proof of delivery of such containers to Lessee, of redelivery of such containers to Lessor, and of the physical condition of the containers at the time of each such interchange.

4) **CONTAINER REDELIVERY PROVISIONS**

   a) No container leased hereunder may be redelivered prior to the tenth anniversary of the LCD. Thereafter, Lessor agrees to accept redelivery of containers from Lessee at the Lessor depots with the monthly quantity limitations shown in Exhibit B attached hereto.

   b) Containers may be redelivered to depot locations or in numbers other than those shown in Exhibit B, provided that such locations, quantities and applicable drop-off charges are mutually agreed upon in writing by Lessor and Lessee before redelivery of any such containers.

   c) In the event of default or other exceptional redelivery prior to the tenth anniversary of the LCD, containers may be redelivered only to Lessor depot locations in Antwerp, Hamburg and Rotterdam, with a monthly limitation of 5 per equipment type.

2

5) **RENTAL CHARGES**

During the term of this Agreement, Lessee shall pay to Lessor the following daily rental charges for each container leased hereunder. Lessee agrees to pay daily rental charges for all containers covered under this Agreement from their respective dates of lease-out through the later of (i) the tenth anniversary of the LCD, or (ii) their respective dates of off-hire pursuant to the terms of this Agreement.

| Equipment Type | Daily Rental Charge |
| --- | --- |
| 20' convertible open top containers | US$1.60 |
| 40' high cube convertible open top containers | US$2.80 |

6) **HANDLING CHARGES**

Lessee shall pay Lessor a handling-in charge of US$25.00 for each container covered under the terms of this Agreement. Such charges shall be invoiced by Lessor directly to Lessee in accordance with Section 8, and are intended to cover the cost of standard lift-on or lift-off a truck, container inspection, and preparation of an Equipment Condition Report. Any additional costs assessed for lifting the containers on or off any conveyance other than truck, including, but not limited to, barge or rail, will be for the account of Lessee.

7) **LEASING PROCEDURE**

The terms and conditions set forth on Exhibit A are hereby incorporated into this Agreement and shall apply to all containers leased under this Agreement. In the event of any conflict between the terms set forth in Exhibit A and the terms of this Agreement, the latter shall prevail.

8) **INVOICING PROCEDURE**

a) Charges for all containers leased by Lessee under this Agreement will be invoiced monthly in US dollars to the following address:

> Megafeeder (Private) Limited
> 15th Floor, P.N.S.C. Building
> Moulvi Tamizuddin Khan Road
> Karachi, 74000, Pakistan

b) Lessee agrees to pay all Lessor invoices in full within 30 days of invoice date. If any items on the invoices are disputed, Lessee will forward a list and explanation of the disputed items to Lessor's San Francisco office with payment in full. In turn, Lessor will undertake to reconcile these disputes within 60 days of receipt by either issuing credit or providing verification of correct billing or combination thereof. So long as Lessor acknowledges the dispute and is attempting in good faith to reconcile the disputed items, Lessee agrees not to withhold any money due Lessor which relates to such disputed items.

3

MEGA-002 rev. 6/14/06

9) **MAINTENANCE**

Lessee shall at its own expense at all times maintain each container in good, safe and efficient working order and keep it fully and properly repaired.

10) **DAMAGE PROCEDURE**

Upon redelivery of a container to Lessor's authorized depot, if Lessor's Equipment Condition Report, executed by Lessor (or Lessor's local agent) and Lessee (or Lessee's local agent), shows the container to be in damaged condition, the following procedure will apply: If the container is found to be damaged, as defined by the Institute of International Container Lessors standards prevailing at the time of redelivery, Lessor or its authorized depot will issue a repair estimate to the Lessee. Lessee shall have 10 working days from the date of redelivery (the "Authorization Period") to authorize the depot to proceed with said repairs as shown on the repair estimate for Lessee's account. If authorization is received within the Authorization Period, the container shall be retroactively off-hired on its redelivery date. If authorization is not received within the Authorization Period, Lessor reserves the right to continue daily rental charges through the date upon which the depot receives authorization to proceed with repairs as estimated for the Lessee's account. Lessee or its local agent agrees to pay all repair charges as billed by Lessor or its authorized depot within 30 days of the date of the invoice therefor.

11) **TOTAL LOSS**

a) In the event a container is lost, stolen, destroyed, or damaged beyond structural or economic repair so as to be rendered incapable of return to Lessor (an "Actual Total Loss"), Lessee shall give notice in writing to Lessor of such Actual Total Loss specifying the container number and providing proof of loss satisfactory to Lessor. Provided Lessee is in compliance with its obligations under this Agreement at the time notice of Actual Total Loss is received by Lessor, Lessor shall thereupon issue an invoice to Lessee for the Depreciated Casualty Value ("DCV") (as set forth in Subsection 11c) of the Actual Total Loss container. Provided that payment of the DCV is made to Lessor within 30 days of the invoice date, daily rental charges will retroactively terminate on the date of Lessor's receipt of such written notice. If payment is not received as aforesaid, daily rental charges shall continue to accrue until payment of the DCV is received by Lessor. Upon receipt of such payment accompanied by an appropriate request by Lessee, title to the Actual Total Loss container will be transferred to Lessee. Any taxes, duties or charges which become payable by virtue of the transfer of title to Lessee shall be for Lessee's account.

b) If Lessee has redelivered a container to Lessor, and Lessee has received a damage estimate in accordance with Section 10, Lessee may, within the Authorization Period, authorize repairs in accordance with the estimate or request that Lessor supply details of the DCV for such container. If Lessor determines that the extent of the damage so warrants (a "Constructive Total Loss"), and provided Lessee is in compliance with its obligations under this Agreement at the time Lessee's request for information on the DCV is received

4

MEGA-002 rev. 6/14/06

by Lessor, Lessor will furnish the DCV for such container, and Lessee shall have the option to pay either the estimated damages or the DCV. If Lessee elects the latter, Lessee shall give notice to Lessor of its election to declare Constructive Total Loss within 7 calendar days of receipt of the details of the DCV and Lessor will issue an invoice for the DCV of such Constructive Total Loss container. Provided that payment of the DCV is received by Lessor within 30 days of the date of invoice therefor, daily rental charges shall terminate on the date of redelivery of the Constructive Total Loss container. If payment is not received as aforesaid, daily rental charges shall continue to accrue until payment is received by Lessor. Unless otherwise elected by Lessor, title to the Constructive Total Loss container will remain with Lessor.

c) In calculating the DCV, the Casualty Value (as set forth below) of the container is depreciated at a rate of 6% per annum, with a 15% residual value, down to a value not less than 30% of the Casualty Value.

| Container Type | Casualty Value |
|---|---|
| 20' convertible open top containers | US$4,000.00 |
| 40' high cube convertible open top containers | US$6,900.00 |

d) Notwithstanding the provisions of Subsections 11a and b, if Lessee is in default of its obligations under this Agreement, unless and until such default(s) has/have been cured in a timely manner or has/have been waived in writing by Lessor, Lessee shall be obligated to Lessor for the full Casualty Value of all Actual Total Loss containers under Subsection 11a, and shall be liable to Lessor, in Lessee's option, for either estimated repair costs or full Casualty Value of Constructive Total Loss containers under Subsection 11b.

## 12) INSURANCE

a) Without prejudice to any other obligations of Lessee under this Agreement, Lessee shall, at its own expense, obtain and continuously maintain in effect while any containers remain on lease to Lessee, insurance policies adequately insuring the containers against all risks of loss or damage, cargo damage and liability to third parties providing, at a minimum, the following coverages or the equivalent thereof:

   (i) All risks of loss or damage as per Institute Container Clauses -- Time (All Risks) with an insured amount equivalent to the Casualty Value of all containers leased hereunder, subject to a deductible not exceeding US$5,000.00 each and every accident and/or series of accidents and/or each and every occurrence and/or series of occurrences. However, the deductible as aforesaid shall not be applicable in the event of Actual Total Loss and/or Constructive Total Loss and/or General or Partial Average and Salvage Charges and/or Sue and Labor Charges;

   (ii) Risks of War and Strikes as per Institute War and Strike Clauses -- Container (Time);

   (iii) Comprehensive General Liability insurance, including cargo liability, insuring against bodily injury and property damage, with a minimum

5

      combined limit of liability of US$1,000,000.00 for each and every accident and/or series of accidents and/or each and every occurrence and/or series of occurrences.

b) The insurance policies required hereunder shall be issued to Lessee and Lessor shall be named as Additional Insured and Direct Loss Payee as its interests may appear. Such policies shall provide that cancellation of such coverages shall be ineffective as to Lessor without 30 days prior written notice of cancellation to Lessor from the underwriters thereof. Insurance certificates evidencing the foregoing coverages shall be furnished to Lessor by brokers or underwriters reasonably acceptable to Lessor prior to the delivery of any containers to Lessee pursuant to this Agreement.

c) All policies to be provided by Lessee hereunder shall provide that Lessor may, but is not obligated to, pay the premiums thereof if Lessee fails to do so in a timely manner so as to keep the required coverages in effect without interruption. Should Lessee default in its obligations to provide uninterrupted insurance coverages pursuant to this section for any reason, Lessor may, but is not obligated to, procure the required coverages on Lessee's behalf. Should Lessor pay premiums under Lessee's policies or procure alternative coverage for Lessee as aforesaid, all sums expended by Lessor in so doing, including reasonable administrative costs incurred by Lessor, shall constitute rent under this Agreement and shall immediately be and become due and payable by Lessee.

## 13) EXCLUSION OF WARRANTIES AND INDEMNITY; LIMITATION OF LIABILITY

a) THE CONTAINERS ARE LEASED AS IS. PROVIDED THAT LESSEE COMPLIES FULLY WITH ITS OBLIGATIONS UNDER THIS AGREEMENT, LESSOR WARRANTS THAT LESSEE SHALL HAVE QUIET POSSESSION OF THE CONTAINERS. SAVE AS AFORESAID, NO REPRESENTATIONS OR WARRANTIES WHATSOEVER OF ANY KIND HAVE BEEN GIVEN BY LESSOR IN RELATION TO THE CONTAINERS, AND ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, WHETHER IN RELATION TO THE FITNESS OF THE CONTAINERS FOR ANY PARTICULAR PURPOSE OR COUNTRY, OR WHETHER IN RELATION TO MERCHANTABILITY OR AS TO DESCRIPTION, STATE, QUALITY, OR CONDITION OF THE CONTAINERS AT DELIVERY OR AT ANY OTHER TIME ARE HEREBY WAIVED, EXCLUDED AND EXTINGUISHED.

b) Lessee shall indemnify and hold Lessor harmless from all liability, damage, cost or expense, including, without limitation, expenses in prosecuting or defending any claim or suit such as attorney's fees, court costs and other expenses arising out of (i) any failure of Lessee to comply with its obligations under this Agreement; (ii) any claim, whether private or governmental, for personal injury or death, or for loss of or damage to person, property, cargo or vessels arising out of or incident to the ownership, selection, possession, leasing, operation,

6

MEGA-002 rev. 6/14/06

    control, use, storage, loading, unloading, moving, maintenance, delivery, or return of the containers, and (iii) the containers and any forfeiture, seizure, or impounding of, or charge or lien thereon, and any loss thereof or damage thereto. Each party undertakes promptly to give notice to the other of claims against it or action against it with respect thereto, and Lessee agrees not to settle any action without the consent of Lessor. Lessee agrees to assume, on behalf of Lessor, the defense of any action or proceeding which may be brought by any third party against Lessor and to pay all costs and expenses of whatever nature in connection therewith, and to pay on behalf of Lessor the amount of any judgment or award that may be entered against Lessor with respect thereto.

c) For the term of this Agreement, so long as Lessee is not in default of this Agreement, Lessor hereby assigns to Lessee, Lessor's right, title and interest in the warranties relating to the containers, which warranties Lessor in turn has received from CNC and the manufacturer of the containers. If Lessee defaults under this Agreement, at the time of such default, the warranties shall be deemed reassigned back to Lessor and Lessee shall have no further right, title, or interest in such warranties.

d) LESSEE FULLY AND FOREVER DISCHARGES AND RELEASES LESSOR, ITS OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, AND AFFILIATES, FROM ANY AND ALL LIABILITIES, CLAIMS, DEMANDS, ACTIONS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, BASED ON THE SPECIFICATION, DESIGN OR MANUFACTURE OF THE CONTAINERS, RESULTING IN CONSEQUENTIAL DAMAGES, LOSS OF PROFITS, PERSONAL INJURY, DEATH, PROPERTY DAMAGE, COSTS, EXPENSES, OR ANY DAMAGE WHATSOEVER, WHETHER CAUSED BY LESSOR'S NEGLIGENCE OR FOR ANY OTHER REASON. LESSEE EXPRESSLY WAIVES AND RELINQUISHES ALL RIGHTS AND BENEFITS THAT LESSEE MAY NOW HAVE, OR IN THE FUTURE MAY HAVE, AS TO THOSE MATTERS RELEASED HEREIN, UNDER THE TERMS OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE AND ANY SIMILAR LAW OF ANY STATE OR TERRITORY OF THE UNITED STATES. SAID SECTION PROVIDES: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

## 14) EXPIRATION

Upon expiration of this Agreement, all terms and conditions of this Agreement shall continue with respect to all containers on lease to Lessee on the date of expiration until all such containers are redelivered to Lessor.

Please indicate your acceptance and agreement to the foregoing by signing and returning three originals of this Agreement to Lessor. Upon Lessor's receipt and execution of said

7

MEGA-002 rev. 6/14/06

originals, the Agreement shall constitute a binding agreement between Lessor and Lessee, and one original will be promptly returned for your files.

|  |  |
|---|---|
| CAI-INTERPOOL, LLC | MEGA & FORBES GROUP OF COMPANIES |
| By:_____ | By:_____ |
| Title:_____ | Title:_____ |
| Date:_____ | Date:_____ |
|  | MEGAFEEDER (PRIVATE) LIMITED |
|  | By:_____ |
|  | Title:_____ |
|  | Date:_____ |

8

EXHIBIT A
GENERAL TERMS AND CONDITIONS

1. **DELIVERY OF EQUIPMENT**
By execution of each ECR with respect to each item of equipment delivered to Lessee under this Agreement, Lessee conclusively acknowledges receipt thereof in good and leasable condition. Lessee agrees to return such equipment to Lessor in as good condition as received from Lessor, normal wear and deterioration excepted, and to execute Lessor's ECR upon redelivery to Lessor identifying and acknowledging any changes in the condition of the equipment while on lease to Lessee. Any changes in the equipment which could have been prevented by normal maintenance shall not constitute normal wear and deterioration and shall be deemed to be damage.

2. **RENTAL AND OTHER CHARGES**
a. Lessee agrees to pay rental charges for the equipment in the amount(s) set forth in this Agreement from the day such equipment is delivered and/or interchanged to Lessee until the day such equipment is returned to Lessor. However, if the equipment is not returned in good condition, Lessee agrees to pay for the cost of any necessary repairs together with rental charges through the date such repairs are approved by Lessee. Further, in the event no fixed lease term is specified for the equipment, Lessor may, upon written notice to Lessee, (i) prospectively adjust the initial rental charges to Lessor's then current average spot lease rate for such equipment on or after the 18 month anniversary of the lease out date of such equipment, or (ii) require that Lessee redeliver the equipment within 30 days of such notice in accordance with the redelivery provisions set forth herein. In the event a fixed lease term is specified for the equipment, Lessor may (unless otherwise provided elsewhere in this Agreement), upon written notice to Lessee (i) prospectively adjust the rental charges for such equipment to Lessor's then current average spot lease rate for such equipment on or after the 6 month anniversary of the expiration of the fixed term, or (ii) require that Lessee redeliver the equipment within 30 days of such notice in accordance with the redelivery provisions set forth herein.
b. Lessee shall return all equipment to Lessor's terminal at the point(s) of termination designated herein or, if no point(s) of termination have been so specified, to the locations specified in writing by the Lessor to Lessee. Furthermore, upon such redelivery, Lessee agrees to pay Lessor the applicable equipment drop-off charge(s) shown herein, or, if no such charges are specified herein, the applicable drop-off charges contained in Lessor's current drop-off charge schedule. Lessor may close any redelivery location(s) specified herein or reduce the monthly redelivery limits specified for any such depot location(s) with immediate effect by giving written notice thereof to Lessee if such closure(s) or quantity reduction(s) is/are due to circumstances beyond Lessor's control, including, but not limited to, changes in applicable law and/or natural disasters.
c. All service charges incurred in transferring the equipment including, but not limited to, handling charges, transportation charges and chassis use fees, and all service charges imposed by any bank or other organization in connection with payment of monies due to Lessor, shall be for the account of Lessee.
d. Unless otherwise indicated herein, all payments due to Lessor shall be payable in United States Dollars and shall be paid to Lessor within fifteen (15) days of the date of Lessor's invoice(s), at the address for Lessor shown herein. In the event Lessor's invoice(s) is/are not paid when due, Lessor may, without prejudice to any other remedy it may have, charge, as additional rental, a service charge at the rate of the lesser of eighteen (18) percent per annum or the maximum amount permitted by applicable law, until the balance is paid in full.
e. It is expressly understood and agreed that (i) equipment furnished to Lessee hereunder is necessary to and leased for use aboard vessels owned, operated, chartered and/or managed by Lessee for ocean transportation of goods and for land transportation incidental thereto, (ii) equipment furnished to Lessee hereunder is made available not only on the credit of the Lessee but also on the credit of such vessels as aforesaid, and (iii) to the extent permitted by law, Lessor has and may assert maritime liens against such vessels for any breach of Lessee's obligations to Lessor with respect to such equipment as set forth in this Agreement.

3. **RISK OF LOSS AND DAMAGE**
Lessee is liable to Lessor for all damage to or loss or destruction of the equipment subsequent to its delivery to Lessee and prior to its return to Lessor except that caused by normal wear and deterioration. Normal wear and deterioration shall not include damage caused by forklifts or other handling equipment.
a. DAMAGE. In the event Lessee fails to repair damage to the equipment prior to returning it to Lessor, Lessor or its authorized depot will present a repair estimate to Lessee or Lessee's local agent for approval. Lessee shall be liable to Lessor for the cost of such repairs and for rental charges for the equipment which shall continue until the day on which Lessee or its authorized agent approves the repairs as set forth in the estimate. Lessee will, at Lessor's request, make payment of repair costs directly to the appropriate repair company and pay any and all storage charges incurred as a result of Lessee's failure to approve repairs on a timely basis.
b. LOSS OR TOTAL DAMAGE. In the event of loss, theft or destruction of the equipment (an "Event of Loss") or damage thereto which Lessor, in its sole discretion, shall determine is not structurally or economically repairable (an "Event of Constructive Loss"), rental charges for the affected equipment shall terminate (1) upon receipt by Lessor of written notice from Lessee of an Event of Loss, or (2) upon issuance by Lessor of a written notice to Lessee of an Event of Constructive Loss, provided in either event that payment of the Casualty Value for a like item of equipment (as set forth herein or in Lessor's then current Casualty Value Schedule) is made to Lessor within 30 days of such notice. If payment is not made within such 30 days, rental charges shall continue unabated until payment of the Casualty Value is received by Lessor. General payments by Lessee shall not be applied to charges for the Casualty Value of equipment unless so specified by Lessee. Further, if any equipment is subject to an Event of Loss or Event of Constructive Loss prior to the expiration of any fixed term specified for such equipment, Lessor shall have the right but not the obligation to supply a like item of equipment to Lessee, whereupon Lessee agrees either (1) to lease such substitute equipment, or (2) if Lessee elects not to lease the substitute equipment, to pay Lessor any shortfall between the historic rental charges for the original item of equipment and the contractual rental charges for said fixed term.

4. **OPERATION, MAINTENANCE AND REPAIR**
a. Lessee shall use the equipment properly and shall, at its sole cost and expense, maintain the equipment in good repair and safe operating condition. Such maintenance shall include but not be limited to the replacement of all badly worn or broken parts with new parts of equivalent design and material, as well as the abrasive cleaning, priming and top coating of all corroded areas on a routine, as needed basis. Lessee shall be liable for any repairs wrongly made or incompatible with the standards set forth in the Repair Manuals issued from time to time by the Institute of International Container Lessors. Lessee shall be responsible for all cleaning and decontamination costs with respect to equipment contaminated by cargo or otherwise and for removal of all debris and shoring from any containers leased hereunder prior to their return to Lessor. Lessee shall be liable for all costs and losses to Lessor arising out of Lessee's failure to repair or maintain the equipment in good condition. If the foregoing obligations are performed by Lessor, all expenses relating thereto will be for the account of Lessee.
b. Lessee shall use the equipment in accordance with good operating practices and so as to comply with all loading limitations, handling procedures and operating instructions prescribed by the manufacturer(s) thereof and by Lessor, including, but not limited to, current Regulations and Recommendations of the International Organization for Standardization and applicable local regulations, and shall prevent usage which may damage or shorten the life of the equipment such as excessive impact and unbalanced loading. Lessee shall not use the equipment for storage or transportation of goods which could damage the equipment including, without limitation, unprotected corrosive substances, poorly secured materials or bulk commodities which may corrode, oxidize, severely dent, puncture, contaminate, stain or damage the equipment.
c. Container(s) supplied hereunder shall be used solely in international trade unless the use thereof in domestic transportation of goods is expressly permitted elsewhere in this Agreement.
d. Receipt or delivery of equipment or any other act by an agent or employee of, or independent contractor engaged by, Lessee shall be deemed to be the act of Lessee and shall be binding upon Lessee.
e. Lessor's equipment is identified by appropriate lettering and numbering, which Lessee agrees not to change or obliterate. Notwithstanding the foregoing, at the written request of Lessor, Lessee shall change or supplement such marks as Lessor shall request. Lessee may, however, add other markings as may be required, provided that such additional markings will be removed and the surface of the equipment shall be in the same condition as prior to the addition of such markings when the equipment is redelivered to Lessor. If Lessee fails to remove such additional markings, Lessor shall remove such markings at Lessee's cost.
f. Lessee shall be responsible for the cost of removal of any intentional or unintentional amendments, alterations, or modifications made to the equipment and for returning the equipment to the same condition in which it was originally received by Lessee.
g. Lessee shall at its expense comply with all laws, regulations and orders which in any way affect the equipment or its use, operation or storage. Lessor shall have no responsibility for compliance with any such laws, regulations or orders, including, without limitation, all such laws, regulations or orders as may relate to customs, transportation, handling, safety and labor regulation.
h. Lessee shall at its expense comply with all rules and practices of ports, depots, storage areas and transportation companies consistent with the other requirements of this Section 4.
i. Lessor shall deliver containers to Lessee which fully comply with the rules and standards of the International Convention for Safe Containers ("CSC"). Such containers shall have affixed CSC plates or CSC plates with an ACEP (Approved Continuous Examination Program) mark. It shall be the obligation of Lessee to comply with the CSC in all respects and Lessee shall have and exercise Lessor's responsibilities under the CSC including, without limitation, plating (design-type approval to be obtained and plates to be provided by Lessor), maintenance, examination, re-examination and marking of each container. Such examination or re-examination shall be performed in accordance with the Rules and Regulations for the Safety Approval of Cargo Containers of the United States Department of Transportation. Lessee shall also comply with the Customs Conventions on Containers, 1956 and 1972, including, without limitation, all obligations of the operator relating to temporary admission, transport of goods under customs seal, maintenance of records and reporting to governmental authorities.

5. **DEFAULT, REMEDIES UPON DEFAULT**
a. Should Lessee (i) default in the timely payment of any sum due to Lessor with respect to the equipment, or (ii) default in the performance of its other obligations with respect to the equipment hereunder or under any other lease contract(s) made between Lessor and Lessee, or (iii) suffer any distress, execution or other legal process which has the effect of a levy on any of the equipment leased hereunder or thereunder, or (iv) cease doing business as a going concern, become insolvent, commit an act of bankruptcy, or become the subject of any proceeding under any applicable Bankruptcy Act, or (v) be seized or nationalized or should any of Lessee's assets be seized by a government or governmental instrumentality; then Lessor may without notice and without relieving Lessee of its obligations hereunder, terminate the leasing of the equipment, invoke the default provisions hereof and/or of any other leases made between Lessor and Lessee, declare the balance of all rental accrued and to be accrued hereunder and thereunder to be due and payable, demand and retake possession of the equipment and all other equipment leased by Lessor to Lessee free of any claims of Lessee, assert maritime or other liens against Lessee's property wherever it may be found, and exercise any other right or remedy available to Lessor under applicable law. In the event Lessor terminates the leasing of equipment or invokes the aforesaid default remedies, Lessee shall no longer be in possession of Lessor's equipment with Lessor's consent, and the rental payable therefor shall immediately increase to the spot lease rates

9

MEGA-002 rev. 6/14/06

charged by Lessor for like type equipment at the time of default. Lessee shall immediately notify Lessor of the exact location of the equipment. If Lessee fails to redeliver such equipment to Lessor within twenty days of Lessor's demand for redelivery, Lessor may retake possession of any or all of its equipment in the possession of Lessee, and for such purpose may enter upon any premises belonging to or in the occupation or control of Lessee. LESSEE HEREBY WAIVES ANY AND ALL RIGHTS TO A JUDICIAL HEARING PRIOR TO LESSOR'S REPOSSESSION OF THE EQUIPMENT.

b. Lessee shall continue to pay rental charges for equipment until (i) the equipment is returned to Lessor in as good condition as received, normal wear and deterioration excepted, or (ii) the equipment is repaired and fit for subsequent rental, or (iii) settlement for the equipment is made. In the event Lessor retakes possession of all or any part of the equipment, Lessee authorizes Lessor to take possession of any property in, on, or attached to such equipment which is not the property of Lessor, and without liability for its care or safekeeping, to place such property in storage at the risk and expense of Lessee. Lessee further agrees to pay Lessor upon demand the Casualty Value of any equipment which has not been returned within the foregoing twenty day period. Upon such return or repossession of the equipment, Lessee will pay immediately to Lessor, as liquidated damages for loss of a bargain, which the parties agree are fair and reasonable under the circumstances existing at the time this Agreement is entered into, and not as a penalty, and in lieu of any further payments of rent for the equipment, the following: (aa) all rent and other amounts due for such equipment as of such date of return or repossession, (bb) an additional payment of three month's rent for the equipment to compensate Lessor for the reasonable estimate of the time and expense required to locate a new Lessee for the equipment (the "Remarketing Period"), (cc) an amount equal to the present value of the difference between the total remaining rental payments for the unexpired minimum lease term, if any, (commencing at the end of the Remarketing Period) and the fair market rent for the same period discounted at a rate per annum equal to the discount rate for 13-week Treasury Bills as of the date on which the equipment is returned or repossessed (as such rate is reported in the Money Rates column in the Wall Street Journal), and (dd) any and all incidental damages suffered by Lessor as a result of Lessee's default, less any expenses saved by Lessor in consequence of the default.

c. Without in any way limiting the obligations of Lessee hereunder, Lessee hereby irrevocably appoints Lessor as the agent and attorney-in-fact of Lessee, with full power and authority at any time that Lessee is obligated to deliver possession of any equipment to Lessor, to demand and take possession of such equipment in the name and on behalf of Lessee from whomsoever shall be at the time in possession of such equipment.

d. Lessee hereby irrevocably waives any immunity from jurisdiction to which it might otherwise be entitled (including but not limited to any immunity afforded to Lessee by the United States Foreign Sovereign Immunities Act or any similar legislation, rules or regulations of any other countries having applicability to Lessee) in any action arising out of or relating to the equipment or to this Agreement which may be instituted in any court or arbitration proceedings in or outside of the United States of America. Lessee further irrevocably waives any immunity from the execution or enforcement of any judgment obtained in any legal action or arbitration proceeding worldwide.

e. Termination of the leasing of the equipment as a result of Lessee's default shall not relieve Lessee of any liabilities or obligations to Lessor accrued prior to such default and Lessee shall in any event remain fully liable for reasonable damages as provided by law, and for all costs and expenses incurred by Lessor on account of such default including all costs of recovering equipment, legal costs and reasonable attorney's fees. Nothing in this paragraph shall be construed to waive any remedy or relief available to Lessor hereunder, in equity, in admiralty, or at law upon the occurrence of any event set forth in this section.

f. Any forbearance by Lessor to enforce its rights hereunder in the event of a default by Lessee shall not constitute a waiver of Lessor's rights, nor shall said forbearance waive Lessor's rights with respect to any other failure by Lessee to comply strictly with its obligations to Lessor.

6. LIMITATION OF WARRANTIES
a. THE EQUIPMENT IS LEASED AS IS. PROVIDED THAT LESSEE COMPLIES FULLY WITH ITS OBLIGATIONS UNDER THIS AGREEMENT, LESSOR WARRANTS THAT LESSEE SHALL HAVE QUIET POSSESSION OF THE EQUIPMENT. SAVE AS AFORESAID NO REPRESENTATIONS OR WARRANTIES WHATSOEVER OF ANY KIND HAVE BEEN OR ARE GIVEN BY LESSOR IN RELATION TO THE EQUIPMENT, AND ALL REPRESENTATIONS AND WARRANTIES WHETHER EXPRESS OR IMPLIED, WHETHER IN RELATION TO THE FITNESS OF THE EQUIPMENT FOR ANY PARTICULAR PURPOSE OR COUNTRY, OR WHETHER IN RELATION TO MERCHANTABILITY OR AS TO DESCRIPTION, STATE, QUALITY, OR CONDITION OF THE EQUIPMENT AT DELIVERY OR AT ANY OTHER TIME ARE HEREBY WAIVED, EXCLUDED AND EXTINGUISHED.

b. LESSEE'S OBLIGATIONS UNDER THIS AGREEMENT ARE ABSOLUTE AND SHALL NOT BE AFFECTED BY ANY CIRCUMSTANCE OR EVENT BEYOND LESSEE'S CONTROL, OF WHATEVER NATURE.

c. Lessee will not suffer to be created, nor permit to be continued, nor fail to discharge, any lien or encumbrance incurred by Lessee or its agents against the equipment covered hereunder, nor shall Lessee or its agents procure any document of title which might at any time encumber the owner's title to or infringe upon Lessor's possessory rights to the equipment at expiration or earlier termination of the leasing thereof to the Lessee.

7. NOTICES
All billings, payments and written notices from either party to the other shall be given to the addresses shown herein, to Lessee's local agent, or to such other address as may be designated in writing by either party from time to time and shall be deemed to have been received upon delivery to the party to whom they are directed.

8. TAXES, FEES AND FINES
a. Lessee shall pay all taxes (other than taxes on Lessor's net income) and charges levied on the equipment or in connection with the use, storage, operation or possession by Lessee of the equipment or levied against or based upon the amount of rentals paid or to be paid with respect thereto, or any other taxes levied against or based upon the leasing thereof to Lessee or subsequent to delivery to Lessee, including, without limitation, property, sales, use and excise taxes, duties, customs tariffs and impositions of federal, state, foreign and local governments and agencies. Taxes, duties, charges etc. levied on the equipment due solely to the ownership thereof shall be for Lessor's account unless such taxes are assessed because of the presence of the equipment in a taxing jurisdiction as a result of Lessee's use of the equipment.

b. Lessee shall pay all charges incurred in ports, depots, storage areas or otherwise arising out of the use of the equipment.

c. Lessee is not entitled to claim any investment tax credits or depreciation deductions or any other tax benefits normally associated with ownership of any of the equipment covered hereunder. Lessee hereby warrants that it will not claim any such investment tax credits, depreciation deductions or other such tax benefits.

9. INDEMNITY
a Lessee shall indemnify and hold Lessor harmless from all liability, damage, cost and expenses (including, without limitation, expenses in prosecuting or defending any claim or suit such as attorney's fees, court costs and other expenses) arising out of (i) any failure of Lessee to comply with its obligations hereunder, (ii) any claim whether private or governmental, for personal injury or death, and for loss of or damage to person, property, cargo or vessels arising out of or incident to the ownership, selection, possession, leasing, operation, control, use, storage, loading, unloading, moving, maintenance, delivery or return of the equipment, and (iii) the equipment and any loss of or damage thereto, or any forfeiture, seizure, or impounding of, or charge or lien on the equipment. Each party undertakes promptly to give notice to the other of such claims against it or actions against it, and Lessee agrees not to settle any action without the consent of Lessor.

b. Lessee shall maintain third party liability insurance, cargo damage insurance, and all risk property loss and damage insurance (including General Average) with respect to all equipment covered hereunder. All such insurance shall be written by reputable underwriters and shall be in amounts and on terms which are satisfactory to Lessor. Lessee shall deliver certificates of insurance to Lessor evidencing the aforesaid coverages and naming Lessor as an additional insured and loss payee thereunder as its interests may appear.

10. SUBLEASING, DIRECT INTERCHANGING AND ASSIGNMENT
a. LESSEE SHALL NOT HAVE THE RIGHT TO ASSIGN THIS AGREEMENT OR TO ASSIGN, SUBLET, RENT, DIRECTLY INTERCHANGE OR OTHERWISE HIRE OUT OR PART WITH POSSESSION OF THE EQUIPMENT TO ANY OTHER PARTY (OTHER THAN TO THE CARE OF CONNECTING CARRIERS IN THE NORMAL COURSE OF LESSEE'S BUSINESS) WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR AND SUCH CONSENT OF LESSOR, IF GIVEN, SHALL NOT OPERATE TO RELIEVE LESSEE OF ANY OF ITS OBLIGATIONS HEREUNDER.

b. Lessor may delegate, assign, pledge or encumber in whole or in part this Agreement, the equipment leased hereunder, and/or the rentals and other charges due with respect thereto. Lessee agrees to pay in full rentals and other charges as accrued to Lessor's assignee, regardless of any defenses, counterclaims or set-offs which Lessee might have against Lessor.

11. GENERAL
a. This agreement is binding upon the parties, their permitted successors and assigns and shall be construed and interpreted in accordance with the laws of the United States of America and, except where inconsistent therewith, with the laws of the State of California. With respect to any claim or controversy arising out of or relating to this agreement, the parties consent to the jurisdiction of the State and Federal Courts located in San Francisco, California, U.S.A.

b The paragraph headings in this agreement are for convenience only and shall not be deemed to alter or affect any provision hereof.

c. The equipment furnished hereunder is provided to Lessee under a net lease contract. Lessee waives any and all existing and future defenses, set-offs, or counterclaims against rental charges or payments due to Lessor with respect to the equipment, irrespective of the rights which Lessee may have against Lessor or any other party.

d. Lessee agrees to supply on request from Lessor, equipment tracking reports produced in the regular course of Lessee's business showing the location of all equipment on lease to Lessee from Lessor.

e. Lessee agrees to supply audited financial statements on request to Lessor and Lessor agrees to keep such statements confidential.

f. This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and may be amended, modified or changed only by an additional agreement in writing executed by the parties hereto. If Lessee fails, however, to give to Lessor written objection to its contents within seven (7) days after this Agreement is received or if Lessee takes possession of any of the equipment provided hereunder and retains it after receipt of this Agreement then this Agreement shall be effective and binding upon Lessee whether or not signed.

g. Any action by Lessee against Lessor for any default by Lessor under this Agreement, including breach of warranty or indemnity, shall be commenced within one (1) year after any such cause of action accrues.

CAI-INTERPOOL, LLC

CON-GEN (Rev. 8/02)

10

MEGA-002 rev. 6/14/06

EXHIBIT B                                                                MEGA-002

| CAI DEPOT | 20' Convertible OT | | 40' HC Convertible OT | |
|---|---|---|---|---|
| | QTY | DOC (US $) | QTY | DOC (US $) |
| **ASIA** | | | | |
| Dalian | 5 | Nil | 5 | Nil |
| Hong Kong | 5 | Nil | 5 | Nil |
| Ningpo | 5 | Nil | 5 | Nil |
| Qingdao | 5 | Nil | 5 | Nil |
| Shanghai | 5 | Nil | 5 | Nil |
| Shekou | 5 | Nil | 5 | Nil |
| Tianjin | 5 | Nil | 5 | Nil |
| Xiamen | 5 | Nil | 5 | Nil |
| Yantian | 5 | Nil | 5 | Nil |
| **INDIAN SUBCONTINENT** | | | | |
| Karachi | 5 | Nil | 5 | Nil |
| Madras | 5 | Nil | 5 | Nil |
| Mumbai | 5 | Nil | 5 | Nil |
| **EUROPE** | | | | |
| Antwerp | 5 | Nil | 5 | Nil |
| Hamburg | 5 | Nil | 5 | Nil |
| Rotterdam | 5 | Nil | 5 | Nil |

5/30/06